# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| CENTRAL SANITARY LANDFILL, INC., and ) <br> OTTAWA COUNTY LANDFILL, INC., ) <br> ) <br> Plaintiffs, ) <br> ) Case No. <br> v ) <br> ) HON. <br> WOLVERINE WORLD WIDE, INC., ) <br> and 3M COMPANY ) Jury Trial Demanded <br> ) <br> Defendants. ) | |

## COMPLAINT

NOW COMES Plaintiffs, Central Sanitary Landfill, Inc. ("Central") and Ottawa County Landfill ("Ottawa") (collectively, "Plaintiffs"), by and through their undersigned attorneys, and for their claims against Defendants Wolverine World Wide, Inc. ("Wolverine"), and 3M Company ("3M") (collectively, "Defendants"), state on information and belief as follows:

## INTRODUCTION

1. Central owns and operates the Central Sanitary Landfill ("Central Landfill") located near Pierson Township in Montcalm County. Plaintiff Ottawa owns and operates the Ottawa County Farms Landfill located in Ottawa County, Michigan ("Ottawa Landfill"). Both the Central and Ottawa Landfills are permitted solid waste landfills that primarily accept municipal solid waste collected from regional residential and commercial business customers but also accept certain industrial, construction and demolition and other non-hazardous wastes authorized for disposal in a Type II municipal solid waste landfill generated by its business

1

customers. One of those customers historically included Defendant Wolverine's former leather tannery in Rockford, Michigan (the "Tannery").

2. Wolverine operated its Tannery for over a hundred years to supply its shoe factory with leather. Tannery operations included treating leather with a substance commercially known as Scotchgard™ (hereinafter, "Scotchgard™") to make the leather water and stain repellant. For several years, Wolverine disposed of waste containing Scotchgard™ generated by its Tannery's operations at the Central and Ottawa Landfills.

3. Defendant 3M produced Scotchgard™ and the chief active ingredients 3M engineered for its Scotchgard™ products included persistent and highly mobile compounds known as per- and polyfluoroalkyl substances or "PFAS," including Perfluorooctanoic Acid ("PFOA"), Perfluorooctane sulfonic acid ("PFOS"), and other PFAS. 3M produced Scotchgard™ products with PFAS to make those products resistant to water and stains.

4. Unbeknownst to Central and Ottawa, Wolverine's Tannery waste was contaminated with PFAS, the chief active ingredients 3M engineered for its Scotchgard™ products. Central and Ottawa unknowingly received PFAS, including PFOA, PFOS, and other PFAS, by accepting the Scotchgard™-contaminated waste. As a result, Defendants 3M and Wolverine caused and/or contributed to the presence of PFAS at, around, or from the Central and Ottawa Landfills.

5. Central has implemented a series of actions in connection with the Michigan Department of Environment, Great Lakes, and Energy ("EGLE") to investigate, mitigate, and remediate the release or threatened release of PFOA, PFOS and other PFAS from the Central Landfill, including by sampling drinking water and ground water monitoring wells, providing bottled water and water filtration systems to residents, developing and implementing

groundwater treatment and disposal systems, and has incurred, and continues to incur, response costs related to those actions.

6. Similarly, Ottawa has done its part to manage and respond to the threatened release of PFOA, PFOS and other PFAS via its leachate discharge, including the construction of a specialty injection well to dispose of PFAS containing leachate, and has incurred and continues to incur response costs related to those actions.

7. Defendants 3M and Wolverine are liable to Central and Ottawa under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), as well as Section 20126(a)(1)(b) of Michigan's Natural Resources and Environmental Protection Act ("NREPA"), MCL 324.20126a(1)(b), *et seq.*, for past and future response costs incurred by them to address the releases and/or threatened releases at and around their properties.

**PARTIES**

8. Plaintiff Central Sanitary Landfill, Inc. is a corporation organized under the laws of the State of Michigan with its principal place of business in Phoenix, Arizona. Central is the owner and operator of the Central Sanitary Landfill, located at 21545 W. Cannonsville Road, Pierson, Montcalm County, Michigan.

9. Plaintiff Ottawa County Landfill, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Phoenix, Arizona. Ottawa County Landfill, Inc. is the owner and operator of the Ottawa County Farms Landfill, located at 15550 68th Ave, Coopersville, Ottawa County, Michigan.

10. Plaintiffs are informed and believe, and on that basis allege, that Defendant Wolverine World Wide, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Rockford, Michigan.

11. Plaintiffs are informed and believe, and on that basis allege, that Defendant 3M is a corporation organized under the laws of the State of Delaware with its principal place of business in St. Paul, Minnesota.

## JURISDICTION

12. This Court has exclusive jurisdiction over Plaintiffs' CERCLA claims pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 113(b) and 28 U.S.C. § 1331.

13. This Court has supplemental jurisdiction over Plaintiffs' NREPA claims against Defendants under 28 U.S.C. § 1367. The releases of hazardous substances as a result of the Tannery waste form part of the same case and controversy and are closely related to Plaintiffs' CERCLA claims.

## VENUE

14. This action involves property located in Coopersville, Ottawa County, Michigan and Pierson, Montcalm County, Michigan which lie within the Western District of Michigan.

15. Venue is proper in this Court under Section 113(b) of CERCLA and 28 U.S.C. § 1391(b) because the waste received by Plaintiffs and the release of hazardous substances from that waste which gives rise to the Defendants' liability occurred within this District's boundaries.

## GENERAL ALLEGATIONS

**A. Development and use of Scotchgard™ by 3M and Wolverine.**

16. 3M began developing PFAS for commercial use after recognizing their surfactant properties made them extremely durable and resistant to degradation beginning in the 1940s and 1950s. 3M used these chemicals in the production of a variety of consumer, commercial, and industrial products, including stain repellents like Scotchgard™, fire retardants, and chemical products.

4

17. One of 3M's brand name products that included PFAS as an ingredient was Scotchgard™. The chief active ingredient in Scotchgard™ was PFOS, of which 3M was the primary US-based manufacturer.

18. When 3M designed, formulated, and manufactured PFAS, it simultaneously undertook extensive studies of the impact of PFAS on the environment, as alleged by the State of Minnesota in its 2017 lawsuit against 3M. 3M knew or should have known that PFAS were highly mobile and resistant to environmental degradation, and as a result of disposal of PFAS and PFAS-containing wastes, it was reasonably likely PFAS would be released from the disposal sites and would reach groundwater, surface water, and sediments.

19. On information and belief, Wolverine was a major customer of 3M, purchasing Scotchgard™ directly from 3M. Beginning in approximately 1958, Wolverine purchased more than half the Scotchgard™ 3M sold to tanneries around the world, including more than 94,500 pounds in 1990.

20. Wolverine applied Scotchgard™ to its leather. Tannery waste generated from the manufacture of leather and the Scotchgard™ application process included, among other things, sludge from wastewater treatment, waste hides, leather scraps, waste drums, and debris ("Tannery Waste"), which contained PFAS from Scotchgard™.

21. Wolverine disposed of or otherwise arranged for disposal of its Tannery Waste at the Ottawa and Central Landfills.

**B. 3M's involvement in Wolverine's Scotchgard use and disposal.**

22. The State of Michigan through its environmental agency, the Department of Environment, Great Lakes, and Energy ("EGLE"), has been actively investigating sites that have become contaminated as a result of Wolverine's Tannery operations. Wolverine's Tannery

operations have been linked to multiple contamination investigations in the greater Grand Rapids region, including the Butterworth Landfill and State Disposal Landfill, both of which are federally-listed Superfund sites. In January 2018, the Michigan Department of Environmental Quality (the predecessor to EGLE) filed a lawsuit against Wolverine asserting violations of federal and state environmental laws, alleging that Wolverine's historic manufacturing processes and associated waste disposal practices caused or contributed to environmental damages at multiple locations across the state. *See Mich. Dep't of Env't Quality v. Wolverine World Wide, Inc.*, No. 1:18-cv-0039-JTN-ESC (W.D. Mich.). In February 2020, Wolverine and the State of Michigan resolved the lawsuit via settlement that required Wolverine to pay $69.5 million to investigate, characterize and remediate environmental impacts caused by its Tannery waste disposal practices. 3M also paid approximately $55 million to resolve its liability for Wolverine's response activities as part of the settlement.

23. Wolverine asserted a claim against 3M to recover costs incurred responding to releases of hazardous substances contained in Scotchgard™ at its facilities. *See* Wolverine World Wide, Inc.'s Third-Party Complaint and Demand for Jury Trial, ECF No. 31, *Mich. Dep't of Env't Quality v. Wolverine World Wide, Inc.*, No. 1:18-CV-00039-JTN-ESC (W.D. Mich., Dec. 18, 2018). In its Third-Party Complaint, Wolverine asserts that:

- 3M arranged for disposal of hazardous substances by continuing to sell Scotchgard™ to Wolverine after it had decided to cease production of Scotchgard™ in order to deplete and dispose of existing stockpiles and that neither it nor any rational customer would purchase Scotchgard™ if they knew of the environmental risks associated with it.[1]

---

[1] Wolverine World Wide, Inc.'s Third-Party Complaint and Demand for Jury Trial, ECF No. 31 at ¶¶ 207-211, *Mich. Dep't of Env't Quality v. Wolverine World Wide, Inc.,* No. 1:18-CV-00039-JTN-ESC (W.D. Mich., Dec. 18, 2018).

6

- Wolverine had a decades-long arrangement with 3M in which 3M coordinated with and advised Wolverine on the use of Scotchgard™ to make Wolverine's products resistant to water and stains.[2]

- 3M routinely consulted with Wolverine regarding the application of Scotchgard™ and related performance testing, the proper use and handling of Scotchgard™, and procedures for disposing of waste resulting from the application of Scotchgard™. According to Wolverine, for a period of time, 3M required Wolverine to allow 3M to inspect and study samples of the leather that Wolverine had treated with Scotchgard™, permit a representative of 3M to test Wolverine's products at random, and required Wolverine to send 3M samples of such treated products every 30 days to ensure it met 3M's product specifications.[3]

- 3M authorized Wolverine to use the Scotchgard™ trademark and 3M required Wolverine to comply with 3M's specified application and quality standards.

- 3M controlled, directed, and/or advised on the use and application of Scotchgard™ to Wolverine products through a process that necessarily included the generation of waste, including performing an industrial hygiene survey of Wolverine's production facilities. 3M advised Wolverine on the appropriate waste drainage system to use at Wolverine's production facilities and that 3M was reluctant to alter Wolverine's then-existing waste disposal practices because "[c]ustomers may ask 3M to subsidize this increased cost as it is our product that is requiring the changes."[4]

- 3M not only provided the Scotchgard™ product to Wolverine but guided the engineering of its application and disposal process when requiring Wolverine to adhere to certain production standards. 3M was in a superior position regarding the science of Scotchgard™ and the means of disposal of waste.

24. 3M's participation in Wolverine's disposal of Scotchgard™ waste evidences 3M's intent that at least a portion of the Scotchgard™ would be disposed of through Wolverine's application process. 3M was not indifferent as to the ultimate disposition of Scotchgard™ but rather used its superior knowledge and factored its own interests in directing the disposal process.

---

[2] *Id.* at ¶ 29.
[3] *Id.* at ¶¶ 29-30.
[4] ECF No. 31 at ¶ 82.

7

25. 3M sold Scotchgard™ to Wolverine intending that a portion of it would go unused or be washed off during the application process, requiring disposal.

**C. 3M and Wolverine knew but did not inform Central and Ottawa of PFAS in Scotchgard™ waste**

26. In 1999, Wolverine and 3M executives met at the Pan American Leather trade show to discuss environmental concerns with PFOS, the key ingredient in Scotchgard™. Shortly after the Trade Show on January 15, 1999, 3M sent Wolverine a letter summarizing the meeting in which 3M wrote that chemical exposures could occur from Scotchgard™ use and disposal. In the letter, 3M informed Wolverine that "PFOS are stable molecules and therefore persistent. As such, PFOS has the potential to accumulate in the body with repeated exposures and to resist degradation in the environment." The letter also advised that "[e]xposure could occur from the manufacturing process of 3M and its downstream users, as well as from product use and disposal." 3M advised that it was taking steps to reduce fluorochemical residuals in its waste streams and was prepared to advise downstream users with communications related to the risks of PFAS.

27. 3M and Wolverine knew or should have known of the environmental problems associated with the disposal of fluorinated compounds contained in Scotchgard™ containing Tannery Waste but did not inform Central or Ottawa. Wolverine continued to dispose of Tannery Waste at the Central and Ottawa Landfills.

28. The PFAS described in this Complaint do not include PFAS in aqueous film-forming foams of any kind or type.

**D. Investigation and Response Actions at Central Sanitary Landfill**

29. The Central Landfill is a permitted Type II landfill that accepts municipal solid waste from residential customers and industrial, construction and demolition and other non-

hazardous wastes authorized for disposal in a Type II municipal solid waste landfill from businesses throughout Montcalm, Newaygo, Kent, Mecosta, Gratiot, Isabella, Osceola & Ionia Counties.

30. In November 2017, Wolverine identified Central Landfill as a location where it disposed of or arranged for the disposal of Tannery Wastes including waste leather and wastewater treatment plant sludge containing Scotchgard™ from at least 1984 through 2009.

31. In 2018, under the oversight and in coordination with EGLE, Central sampled groundwater monitoring wells at and around the Central Landfill. Sampling results indicated that the PFAS had migrated from the area where the initial disposal took place.

32. Since that time, at the request of and in coordination with EGLE, Central has taken extensive response actions, including, but not limited to, developing work plans to assess the presence of PFAS; develop a conceptual site model; install groundwater monitoring wells; sample monitoring and private water wells and other environmental media; provide alternative water supplies to affected residents; and design, pilot and construct a groundwater treatment system.

33. Central formerly discharged leachate generated at the Central Landfill via the Grand Rapids Water Resource Recovery Facility ("Grand Rapids WRRF") which discharges to the Grand River. PFAS have come to be located in the leachate generated at the Central Landfill due to the disposal of Tannery Waste. Because of the threatened release of PFAS in the Landfill leachate, Central has also been forced to evaluate and utilize specialized leachate disposal methods.

34. Central continues to expend significant resources and effort to investigate, characterize, monitor, and remediate leachate, groundwater, and other environmental media for the presence of PFAS.

35. Central incurred response costs consistent with the National Contingency Plan to investigate, characterize, and respond to releases of PFAS because of the disposal of Tannery waste impacted with PFAS from Scotchgard™

### E. Investigation and Response Actions at the Ottawa Landfill

36. The Ottawa Landfill is a permitted Type II landfill that accepts municipal solid waste, industrial, construction and demolition and other non-hazardous wastes authorized for disposal in a Type II municipal solid waste landfill.

37. Wolverine disposed of or arranged for the disposal of Tannery Waste at the Ottawa Farms Landfill that contained Scotchgard™ and was contaminated with PFAS.

38. PFAS have come to be located in the leachate generated at the Ottawa Landfill due to the disposal of Tannery Waste.

39. Ottawa formerly discharged leachate generated at the Ottawa Landfill via the Grand Rapids WRRF. Because of the threatened release of PFAS in the Landfill leachate, Ottawa has been forced to manage leachate differently using specialized disposal methods. Ottawa designed, constructed, and operates a deepwell injection facility (hereinafter, the "Ottawa Deepwell") to securely dispose of its leachate.

40. The Ottawa Deepwell consists of a closed leachate treatment system to pretreat leachate prior to injection and two permitted Class I, non-hazardous wells that inject treated wastewater into locations at depths between approximately 5,400 – 7,400 feet below ground

level to prevent the movement of the wastewater. A deepwell allows for the secure injection of nonhazardous wastewater into deep geologic formations with impermeable confining structures.

41. Ottawa has incurred significant response costs to, among other steps, complete a detailed geological study (including modeling, testing and verification, conduct extensive performance testing during construction), construct an onsite pretreatment system to pretreat leachate prior to injection, and construct the first of two deepwells to stringent design specifications.

42. Ottawa incurred response costs consistent with the National Contingency Plan to construct the Ottawa Deepwell to manage and dispose of its impacted leachate because of the disposal of Tannery Waste impacted with PFAS from Scotchgard™.

## COUNT I
## Response Cost Recovery Under
## CERCLA Section 107 (42 U.S.C. § 9607(a))

43. The preceding paragraphs are incorporated herein by reference.

44. Central is a "person" under CERCLA section 101(21), 42 U.S.C. § 9601(21).

45. Ottawa is a "person" under CERCLA section 101(21), 42 U.S.C. § 9601(21).

46. Defendants 3M and Wolverine are each a "person" under CERCLA section 101(21), 42 U.S.C. § 9601(21).

47. The Tannery Waste contains PFOA, PFOS, and other PFAS from the use of Scotchgard™.

48. PFOA and PFOS are "hazardous substances" under CERCLA section 101(14), 42 U.S.C. § 9601(14).

49.     There have been actual and/or threatened releases of PFOA and PFOS from the Central and Ottawa Landfills, including via their receiving WRRF, caused by 3M and Wolverine within the meaning of CERCLA section 101(22), 42 U.S.C. § 9601(22).

50.     The releases of hazardous substances alleged herein have occurred from the Central and Ottawa Landfills, and their receiving POTW, which are each a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

51.     Wolverine contracted, agreed, and/or otherwise arranged for disposal of Tannery Waste containing hazardous substances at the Central and Ottawa Landfills within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

52.     Wolverine transported for disposal Tannery Waste containing hazardous substances at the Central and Ottawa Landfills within the meaning of CERCLA section 107(a)(4), 42 U.S.C. § 9607(a)(4).

53.     3M knew or should have known that PFOA and PFOS from Scotchgard™ had the potential to leach from waste into the environment, were resistant to biodegradation, and were highly mobile once released into the environment. 3M knew or should have known its sale of Scotchgard™ was facilitating the dispersal of hazardous substances, the disposal of which created a substantial environmental and economic liability.

54.     3M knew or should have known that PFAS in effluent from the Scotchgard™ treatment process would not be fully treated by wastewater treatment methods and/or accumulate in wastewater treatment sludge and would not be prevented from entering the environment. 3M intended that the resulting waste would require disposal.

55. 3M knew or should have known that its customer's use of Scotchgard™ generated waste that contained PFAS as part of its customer's manufacturing process, and that environmental exposure would occur from product disposal and the resulting waste.

56. On information and belief, 3M planned and intended for the disposal of PFOA and PFOS by selling Scotchgard™ despite knowing that PFAS from its products would end up in the environment.

57. 3M arranged for disposal of Scotchgard™ and the hazardous substances in it and is liable under CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

58. As a result of releases and threatened releases of hazardous substances for which 3M and Wolverine are responsible, Central and Ottawa have incurred and continue to incur necessary response costs, including investigation, monitoring, and remedial costs, within the meaning of CERCLA section 107(a), 42 U.S.C. § 9607(a), and CERCLA section 101(25), 42 U.S.C. § 9601(25).

59. As a result of releases and threatened releases of hazardous substances for which Wolverine and 3M are responsible, Wolverine and 3M are liable, pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), to Central and Ottawa for past and future costs of response activities that are consistent with the National Contingency Plan.

**COUNT II**
**Declaratory Judgment against Wolverine and 3M under CERCLA**
**42 U.S.C. § 9613(g)(2) & 28 U.S.C. § 2201**

60. The preceding paragraphs are incorporated herein by reference.

61. Having demonstrated that Wolverine and 3M are responsible for response costs under CERCLA Section 107(a) for arranging and/or transporting for the disposal of hazardous substances at the Central and Ottawa Landfills and as a result of releases or threatened releases

from the Central and Ottawa Landfills, Plaintiffs are entitled to a declaratory judgment that Wolverine and 3M are liable for future response costs and damages resulting from that actual or threatened releases, pursuant to 42 U.S.C. § 9613(g)(2), 28 U.S.C. § 2201, and/or Fed. R. Civ. P. 57.

## COUNT III
### Response Cost Recovery under
### NREPA Part 201 (MCL § 324.20126(1))

62. The preceding paragraphs are incorporated herein by reference.

63. Central is a "person" within the meaning of NREPA section 20126, MCL 324.20126. MCL 324.301(h).

64. Ottawa is a "person" within the meaning of NREPA section 20126, MCL 324.20126. MCL 324.301(h).

65. 3M is a "person" within the meaning of NREPA section 20126, MCL § 324.20126. MCL 324.301(h).

66. Wolverine is a "person" within the meaning of NREPA section 20126, MCL § 324.20126. MCL 324.301(h).

67. PFOA and PFOS are "hazardous substances" under NREPA section 20101(1)(x), MCL 324.20101(1)(x), because those compounds are defined as "hazardous substances" under CERCLA. They are also hazardous substances under NREPA section 20101(1)(x), MCL 324.20101(1)(x), because having developed cleanup standards for certain PFAS, EGLE has demonstrated that those constituents meet the definition of NREPA section 20101(1)(x)(i), MCL 324.20101(1)(x)(i).

68. There have been actual and threatened releases of PFAS from the Central and Ottawa Landfills, including via their receiving WRRF, caused by 3M and Wolverine within the

meaning of NREPA sections 20101(1)(pp) and 20101(1)(ccc), MCL  324.20101(1)(pp) and MCL  324.20101(1)(ccc).

69. All releases of hazardous substances alleged herein have occurred from the Central and Ottawa Landfills, making each a "facility" within the meaning of NREPA section 20101(1)(s), MCL  324.20101(1)(s).

70. The Tannery Waste contains PFOA, PFOS, and other PFAS which are hazardous substances, as a result of the use of Scotchgard™.

71. Wolverine contracted, agreed, and/or otherwise arranged for disposal of Tannery Waste containing Scotchgard™, a hazardous substance, a within the meaning of NREPA section 20126(1)(d), MCL 324.20126(1)(d) and is a liable party under NREPA Part 201.

72. Wolverine transported for disposal Tannery Waste containing Scotchgard™, a hazardous substance, at the Central and Ottawa Landfills within the meaning of NREPA section 20126(1)(e), MCL 324.20126(1)(e) and is a liable party under NREPA Part 201.

73. 3M arranged for disposal of Scotchgard™, a hazardous substance, within the meaning of NREPA section 20126(1)(d), MCL 324.20126(1)(d) and is a liable party under NREPA Part 201.

74. As a result of releases and threatened releases of hazardous substances for which 3M and Wolverine are responsible, Central and Ottawa have incurred and continue to incur response activity costs, including investigation, monitoring, and remedial costs, within the meaning of NREPA sections 20101(1)(ww) and 20126a(1), MCL 324.20101(1)(ww) and 324.20126a(1). The costs of Central and Ottawa's response activities were reasonably incurred under the circumstances.

75. As a result of releases and threatened releases of hazardous substances for which 3M and Wolverine are responsible, 3M and Wolverine are liable, pursuant to NREPA section 20126a(1), MCL 324.20126a(1), to Central and Ottawa for past and future costs of response activities.

## COUNT IV
### Declaratory Judgment against Wolverine and 3M under NREPA

76. Having demonstrated that Wolverine and 3M are responsible for response costs under MCL 324.20126(1) for arranging and/or transporting for the disposal of hazardous substances at the Central and Ottawa Landfills and as a result of releases or threatened releases from the Central and Ottawa Landfills, Plaintiffs are entitled to a declaratory judgment that Wolverine and 3M are liable for future response costs and damages resulting from that actual or threatened releases, pursuant to MCL 324.20137(1)(d), 28 U.S.C. 2201(a) and/or Fed. R. Civ. P. 57.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Central and Ottawa pray that the Court enter judgment in its favor and against Defendants 3M and Wolverine as follows:

A. For payment of all necessary costs of response that are consistent with the National Contingency Plan, which were incurred by Plaintiffs as a result of any release or threatened release of hazardous substance at and/or around the Central and Ottawa Landfills under CERCLA section 107(a), 42 U.S.C. § 9607(a);

B. For a declaratory judgment, under 42 U.S.C. § 9613(g), 28 U.S.C. § 2201, and/or Fed. R. Civ. P. 57, that Defendants are jointly and severally liable for costs, damages and liability Plaintiffs have or will incur as a result of any threatened release of hazardous substances

16

at and/or around the Central and Ottawa Landfills under CERCLA § 107(a), 42 U.S.C. § 9607(a) and under NREPA sections 20126, MCL 324.20126.

    C.     For payment of all necessary costs of response, removal and/or remedial action costs, costs of abatement and liability incurred by Plaintiffs as a result of any release or threatened release of hazardous substances at and/or around the Central and Ottawa Landfills under NREPA sections 20126(1), MCL 324.20126(1);

    D.     For Plaintiffs' costs of suit herein;

    E.     For interest on any money judgment; and

    F.     For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Central Sanitary Landfill, Inc. and Ottawa County Landfill, Inc. demand a trial by jury of all issues properly triable by jury.

DATED: December 4, 2025

Respectfully submitted,

/s/ Frederick A. Berg, Jr.
Susan L. Johnson (P36835)
Frederick A. Berg, Jr. (P38002)
Butzel Long P.C.
201 West Big Beaver Road, Ste. 1200
Troy, MI 48084
Phone: (248) 258-1616
Fax: (248) 258-1439
johnsons@butzel.com
berg@butzel.com

William G. Beck (MO Bar 26849) (pro hac vice application forthcoming)
Lathrop GPM LLP
2345 Grand Blvd., Ste. 2200
Kansas City, MO 64108
Phone: (816) 292-2000
Fax: (816) 292-2001

>william.beck@lathropgpm.com
>
>Matthew A. Walker (IL Bar 6324810) (pro hac vice application forthcoming)
>Lathrop GPM LLP
>155 North Wacker Drive, Suite 3800
>Chicago, IL 60606
>Phone: 312.920.3364
>matt.walker@lathropgpm.com
>
>*Attorneys for Plaintiffs*

william.beck@lathropgpm.com

Matthew A. Walker (IL Bar 6324810) (pro hac vice application forthcoming)
Lathrop GPM LLP
155 North Wacker Drive, Suite 3800
Chicago, IL 60606
Phone: 312.920.3364
matt.walker@lathropgpm.com

*Attorneys for Plaintiffs*